Hospital Medical Center, 24051. Mr. Steck, are you there? Yes. May I, Your Honor? Yes, of course. Please proceed. In Namovsky v. Norris, 934F3200, a 2019 case, this court discussed the tort origins of proof in civil rights cases. The restatement of torts third says that intent is proven if, quote, the person acts knowing that the consequence is substantially certain to result. In this case, intent is proven that way. Plaintiff was seeking accommodation for her pregnancy throughout the fall, up to a week or so before her termination. Defendant knew plaintiff was six months pregnant. Defendant knew it had to check plaintiff's computer to verify if she had improperly accessed medical records. Defendant's review of plaintiff's computer confirmed her protests that she did not violate HIPAA. I'm sorry. You said she had been seeking family leave by virtue of her pregnancy. For how long? She had been seeking accommodation for her pregnancy, Your Honor, not family leave per se. Accommodation. For how long? For throughout the fall before she was fired. It started in the summer before she was pregnant. But then she continued to pursue that in October and November and she was terminated in December. I thought that she had not revealed her pregnancy until a considerably later date. That is not correct, Your Honor. You argue that her pregnancy became visible at some point. Yeah, well, that was in response to the defense. What does the record show to be the first time that she that she spoke about her pregnancy to her superiors? My recollection is in October, but she had a meeting in November with Kevin Manchester, which was all about her pregnancy. The November is a lot later than the summer. Well, Your Honor, as I pointed out, she started with her seeking accommodation that wasn't related to pregnancy. But in October, she pursued the pregnancy issue in November, had a meeting with Manchester about it. And then on December 7th and December 14th, it was discussed in meetings and she was showing it. Those are the facts. I'm not suggesting that she was pregnant in July. So the defendant knew it had to check plaintiff's computer to verify if she had improperly accessed medical records. And defendants review of plaintiff's computer confirmed her protests that she did not violate HIPAA. Defendant was substantially certain that when you say when you say that, please unpackage that for me, because it appears ultimately, mistakenly, perhaps that the. Defendant genuinely at some point believed that she had violated HIPAA. Would you agree with that? So as of December 7th, defendant had a computer report that the plaintiff had violated HIPAA. The privacy officer, whose name was Star Thornton. When was the decision made to terminate her? The letter of termination was not dated until December 21st. And in fact, the there was a meeting on December 14th where the in light of my client's protestations that she did not do this. They had committed to continuing the investigation. And in fact, they said so to the union. So the argument that miraculously the decision to terminate was made the day before the meeting. It doesn't stand up to the facts. She was not. What are the facts that counter that when you say it doesn't stand up? It's in the record there. We have pointed out. It's not helpful. We had pointed out repeatedly in our brief citing citing to the record that at the meeting of December 14th, there was discussion of her. She was resisting the saying it's not true. They agreed to continue the investigation. There then was an email which is in the record, which is cited in the brief. And the email said to the union, we need time to continue the investigation. If she were fired at that time, they would not have said those things. So she was not fired prior to them reviewing the records of her computer and determining that she had not violated HIPAA. Your excuse me, Mr. Your statement that they had determined that she had not violated HIPAA. I mean, I think obviously that's sort of a critical point here. They hadn't. I mean, I'm looking for what in the record proves that they have determined this. They had this initial let me continue, please. They had this initial report. Then they had the response from I.T. that in and of itself. And I think the I.T. people even said, well, you know, our records, our reviews showing that she didn't access these materials, but perhaps other software could show something else. And so this notion that once they had that, that proves that they knew there was no violation. That doesn't seem supported here. It's one hundred and ten percent supported, Your Honor. The reported violation was in the software that she used called SunQuest. Even in her answer, they have admitted that SunQuest did not permit her to access the records in question. When I.T. reviewed the computer, it reviewed the SunQuest records and the SunQuest records showed no access. The testimony of the privacy officer was clear that she knew full well that you had to check the audit logs in the computer. Speculation as to what other softwares that she wasn't even involved with might reveal would have nothing to do with what they knew at that time, as I've indicated, even in their answer. Can I ask you, though, what are we to make of the fact that if if in fact it was, as you're presenting it, known by these parties that, oh, she she didn't do this, this was completely a mistake. What do we make of the subsequent actions? What do you make of the fact that they're notifying patients that there's this violation months later? Although in your view, they knew that there was not a violation. Well, the fact is that the in at the same time that they were notifying patients, they were making false claims to the union about what the SunQuest software did. They used a printout. They used an Excel spreadsheet and falsely represented to the union that that was a record of SunQuest. It was not. And that's what their own investigation subsequently found. So certainly, in my view, a jury would have the right on all this evidence to decide whether, in fact, they knew. I don't see how you can grant summary judgment just by saying, oh, they sent out some letters to patients. They you know, it's sort of like in the brief. You say you say they knew when you say they knew they knew what? They knew that it was extremely likely. Frankly, they were they should have been certain based on what I told them that she had not accessed HIPAA. In my brief, it's sort of like, well, you know, we might suspect there's a witch and no one's going to persuade us otherwise. So would you agree? Would you agree? I just want to make sure that I completely understand your position. So this is your opportunity. Would you agree that if the employer has a genuine belief that an employee has violated company policy, even though it turns out in retrospect that that's wrong. That that is a legitimate, non-discriminatory reason to terminate. So the good faith belief, all the case law says is a legitimate defense lawyer. However, a good faith belief does not occur when someone has documentation and has the investigation. The own investigation by the employer shows that there was no HIPAA violation. That's not good faith. So I. What what what in the record shows the Mr. Gorsuch? The person who ultimately decides to terminate her. Believes that she did not violate HIPAA. So as indicated, Your Honor, in our brief, Mr. Gorsuch delegated the entire investigation to Trudy Miller and Kevin Manchester, incidentally. So under the theory, what Miller did is attributed to Gorsuch. Gorsuch had just come into his position. He didn't. He testified repeatedly. He knew nothing about any of the softwares involved. He was not actively engaged. I think you just answered. I think you answered my question. So you're relying, as I thought I understood from your briefs entirely on the cat's paw theory with respect to the with respect to Mr. Gorsuch. With respect to Mr. Gorsuch, we the evidence cited in the brief shows that Gorsuch took no active role and the investigation and knew absolutely nothing about it other than what Miller told. Well, we'll hear from your friend, Ms. Harding. I'm sorry, I'm getting a note that the my video was the host has stopped my video. Ms. Harding, I can do many things as the presider. One of the things I cannot do is help you with that, except that I'll ask the courtroom deputy. I appreciate that. Ms. Rodriguez. Yes, I just started her video. Can you see that? Can you start it now, Ms. Klein? I'm still getting the same message. Oh, there we go. Wonderful. Great. Why don't you proceed then. Start the clock. Yeah, 1010. Yes, thank you. Thank you, Ms. Rodriguez. You're very welcome. Thank you all. Thank you, Your Honors. May it please court. I'm Kimberly Harding. I am counsel for happily at Champlain Valley Physicians Hospital. I just like to start by responding to a couple of points that Mr. SEC made, particularly with respect to the knowledge of the operation of SunQuest. I think it's important to note that both Miss Miller and Miss Thornton testified that neither of them were familiar with the SunQuest software or how it operated. In fact, Miss Thornton testified that she had only received preliminary training on fair warning itself. And neither of them understood how SunQuest operated or how it interacted with the system to the extent that Miss Miller is accused of. I believe the phrase was pawning off a purposefully false report. There's no evidence in the record to suggest that she knew what she was providing was not SunQuest. And the union also did not respond in receipt of the information to note that this was not a SunQuest report. There seems to be. Miss Harding, you're not suggesting, aside from the individuals, whether or not they know all the particulars of the software, you're not suggesting that they did not understand the message from IT that their review was showing that the records had not been accessed? I think that's correct, that there was certainly a question being called into the reliability of the report. And I think I would agree that it was maybe the not not the most thorough investigation. But at that point, the testimony all demonstrates that what Miss Miller and again, Miss Thornton, who is noticeably absent from Mr. Steck's description of the major players here, they thought they had a huge confidentiality breach on their hands. And in the absence of other other evidence, they were relying, as they had always done on the fair warning report, which showed a massive breach. Again, to return to Miss Thornton, I think she's she is a critical player. I don't dispute Mr. Steck's assertion that Mr. Gosrick did not take a critical role or a meaningful role in this investigation and that he did delegate it. But the major person to whom he delegated was Miss Thornton. And this is fatal to plaintiff's case. Miss Thornton was not only the person who received the complaint. She is not only the person who initiated the investigation, who ran the first report that demonstrated that plaintiff had accessed the record of the reporting patient. She ran the second report that indicated that plaintiff had accessed numerous other records and perhaps was the individual who perhaps misinterpreted that report or who did misinterpret that report. I don't think there's any dispute about that. She's also the person who communicated to IT. She's the person who communicated with fair warning, and she is the one who made the recommendation to terminate plaintiff. Fatal to plaintiff's case is that it's undisputed that Miss Thornton was not aware of plaintiff's pregnancy. In fact, the two had never met before. Plaintiff contends that her pregnancy was obvious as of the December 14th meeting in which she was suspended pending further investigation. However, the obviousness of plaintiff's pregnancy is merely speculation. Plaintiff merely speculates that Miss Thornton knew on the basis of this, quote, obviousness and disregards the fact that Mr. Gosrick had already determined the plaintiff likely should be fired. The wheels were already in motion, and plaintiff's termination was a foregone conclusion as of the day prior as demonstrated by the emails in the record. Is that really the case, though, that it's a foregone conclusion? I mean, there's a lot of discussion from both parties about sort of the dates of when things happened. And certainly this investigation was put in motion and certain, I guess, individuals had talked about that she would perhaps be terminated. But it actually the process of termination was not complete at that point. Things were ongoing. I guess the union grievance was to come. And so, yes, in December, I don't know which date it was, at one of the early December dates, the wheels started, but it wasn't over yet. And so clearly at some point before this process was over, the relevant parties were aware of, presumably, of her pregnancy. So I would agree to a certain extent. So I think that on December 13th, the parties had determined that her termination was likely. There were communications about it. There's the Gosrick email. And I think there's a difference between a decision and an implementation of a decision. And so certainly employers decide to terminate employees prior to the date of their termination on a regular basis. And I think that is partly what happened here. Secondly, the date of her termination is the operative date, not really the union grievance process. But even still, certain parties, I believe, did become aware of her pregnancy through the note that she submitted. I believe Ms. Miller's communications are probative of that fact, but there's no evidence that Ms. Thornton ever became aware. And I think it's important to review the document submitted to show how obvious the plaintiff's pregnancy purportedly was. Looking at the joint appendix, the photo on page 367 of the joint appendix, plaintiff purports that this photo makes it clear that her pregnancy was so obvious. However, no reasonable juror could conclude that that photo is probative of anything. It's merely a stock photo from a Today.com news article that was posted to plaintiff's Facebook profile by one of her friends. It doesn't show her face. It doesn't indicate that it's even plaintiff. Again, it's connected to a news article. That's page 367 of the joint appendix. Okay. That's unfortunate. We've lost Ms. Gallagher. I'm sorry, Ms. Harding. She ever had awareness. Ms. Harding, you cut out, at least on my screen. So, and that was right after I asked you what page. Just so that you're aware. I appreciate that. Luckily, I did have a lengthy pause, so I don't think you missed much. But my point was only that there is no credible evidence to suggest that Ms. Thornton was aware at any time during this investigation of plaintiff's pregnancy. So your adversary makes reference in the briefing, at least, to this general principle of corporate knowledge. Would you just briefly address that, both in the context of Title VII and in the context of the FMLA claim? May I add something to that question? Of course. As I understand it, well, sometime in mid-December, she spoke to Manchester. And she revealed not only, well, she spoke of her, not only of her pregnancy, but also of her intention to take family leave. And then there is evidence that Manchester may have spoken to Gosrich. Is that correct? Gosrich, yes. May have spoken to him. So why isn't it following, pursuing the question that Judge Lohier asked, why isn't it a fair inference that Manchester, in his position at personnel, would regard a phlebotomist taking leave at this point when the resources were known to be strained? Why isn't that something that would have been obviously disagreeable and unpleasant to him, the prospect of somebody taking leave in a function that was already extremely strained and stretched beyond the pressing the capabilities of those doing it to get the job done? And why is it not a reasonable inference that he spoke to Gosrich about it? In other words, we're not talking just about corporate knowledge. If somebody knows, you assume that everybody knows. But you know that Manchester learned about not only her pregnancy, but her intention to take leave. And the record expressly reflects a likelihood, or at least a possibility, that he spoke to Gosrich about the subject. Thank you, Your Honor. I'll take those in turn. Starting with Judge LaValle. Mr. Manchester, what you're suggesting is pure speculation, first of all, which is not sufficient to defeat summary judgment. But even assuming that... Why is it pure speculation? Because there's... There is... It's not as if the type of discrimination that's being talked about is against a race or a nationality where there's just no reason to suppose. We're talking about somebody taking leave and a personnel manager, a human resources person, facing the prospect of losing somebody in a function that's already understaffed. So, given plaintiff's history, plaintiff herself had taken countless leaves in the past, all of which were accommodated. And it's important to keep in mind that leave administration, even plaintiff testified herself, was not a function performed by Mr. Manchester in his role as director of employee experience. That process was administered by employee health. Despite the countless leaves of absence that plaintiff herself had taken over the years, each of those was accommodated without issue. And again, Mr. Manchester played no role in that process. So, it does become unlikely that he would complain about this to Mr. Gosrick because that really wasn't his function. And I think the record supports that. Secondly, Mr. Manchester, I would credit the allegation that Mr. Manchester was aware of the investigation, that he received periodic reports on the investigation, and that he was aware of the results of the investigation. But there's no other indication that he took a meaningful role in the investigation or that the pregnancy played any role on his part. CVPH and the Fitzpatrick Cancer Center had accommodated countless leaves itself, and plaintiff was no different here. If I have the court's indulgence to answer Judge Lawyer's question with respect to the corporate liability piece, I'll just briefly state that in each of the cases cited by plaintiff with respect to the cat's paw theory, there is some evidence, in most cases, specific evidence of bias, invidious comments, or some other basis to attribute a decision on the basis of pregnancy to the lower-level employee or supervisory employee involved in the process. That evidence is absent here. There's nothing to suggest that actions were taken on the basis of pregnancy. And again, I think that goes back most critically to Ms. Thornton's involvement and her decisions and recommendations, absent any knowledge of the plaintiff's pregnancy. Thank you. Thank you very much. I'm glad we were able to sort out the technical difficulties. We'll hear from Mr. Steck on rebuttal. Thank you, Your Honor. I want to point out that in the recent decision of this court in Maneker, a poor investigation in which all the evidence favoring the plaintiff is disregarded is considered evidence of discrimination. The prior instances in which plaintiff was given leave had nothing to do with any of the individuals involved in making the decisions in this case. I don't understand why it isn't relevant that their own compliance officer did an investigation, found that the employer knew as of December 14th that there had been no access by Larkin, and while the union grievance is pending, they're simply allowed to disregard that and not reinstate the plaintiff. They make an issue that the union went along with this as if it were normal. Well, the union didn't know any of the facts. We didn't know any of the facts until we got all the emails in the litigation. The argument that Thornton is the real decision maker is totally against the policy of the employer and against reality. The policy of the employer quoted in our papers is that HR works and makes the decision based on information given by the privacy officer. And here the privacy officer had clearly informed Miller, the HR rep, that the investigation by IT showed no access. At the December 14th meeting that is mentioned here, Thornton was present. Everything was discussed. My client said she didn't do this. It was impossible for her to do this. They've even acknowledged in their answer that it was impossible for her to do this. So the question at the end of the day, I think, can we say that this case should be dismissed on summary judgment on the grounds that there's no question but that the employer engaged in good faith? I think there's tremendous numbers of questions whether that's true. And I would suggest that a jury should be allowed to decide not simply say because they had some concept that she might have done this when they found out that the audit trail showed she didn't, to then engage in speculation and say, well, she could have used a different software. Or we have secret evidence, which is what they told their own compliance officer who investigated. The compliance officer told the federal government there was no HIPAA violation. They wrote to all the patients and said there's no HIPAA violation. And her investigation showed conclusively that they knew back on December 14th, before she was terminated, she asked for reinstatement for the plaintiff. And the director of the hospital said that we should bring her back because it's clear. I forget the exact language. We're going to have to eat this one was the exact language. And then she said, well, but we can't bring her back to her prior job. There's no reason for that. It shows retaliatory animals. Thank you very much, Your Honor. Question. Yeah, it seems to me that this is a case in which there are quite reasonable arguments being made on both sides. And I am wondering whether during the course of the submission of this appeal, whether there have been real efforts made by the parties to reach settlement. Have the parties been engaging? We had, if I recall correctly, time certainly passes. But as I recall correctly, we did have a mediation under the auspices of the court. And I don't recall any progress being made on that. So you went through the camp process, the mediation process? Yes. When was that? Oh, gosh. It seems like eons ago to me, Your Honor. I apologize. I mean, I'm sure I could check my calendar. OK, no, but I would say nine months ago. Thank you. Thank you very much. We'll reserve decision.